

FILED & ENTERED

APR 07 2010

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY ngo        DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

In re:

COBALIS CORPORATION,

Debtor(s).

Case No: 8:07-bk-12347-TA

Chapter: 11

STATEMENT OF DECISION ON PLAN CONFIRMATIONS

Date:   March 24, 2010
Time:   11:00 a.m.
Location:  5B

   This matter was heard March 24, 2010, regarding confirmation of the two rival plans submitted, respectively, by the debtor and its principal secured creditor, YA Global Investments, L.P. ("YA Global").  The Court has considered the briefs and testimony of the witnesses on both sides, and has received into evidence virtually all of the exhibits offered by each side.[1]   The Court took the matter under submission and now issues this Statement of Decision.

---

[1]  By stipulation the vast majority of all exhibits were admitted.  Only three exhibits were excluded, Debtor's Exhibits DD, EE and FF.

## 1. Background

A very brief synopsis of the background might be helpful.  The debtor, Cobalis Corporation, a Nevada corporation ("debtor"), has been a start-up company for all of its 13-year existence.  Originally known as "Aztec Ventures," it started out in the pay phone services business.  In 2001 debtor changed its name to "Togs for Tykes, Inc." and tried the children's apparel business.  Neither venture was successful.   In 2003 debtor focused on over–the–counter medications and nutraceuticals used to treat allergies.  Through a reverse merger in July 2004 it acquired BioGentec Incorporated, f/k/a Allergy Limited, f/k/a St. Petka, Inc.  On July 6, 2004, the debtor changed its name to Cobalis.  Debtor's flagship product is the patent to a vitamin B-12 supplement, active ingredient Cyanocobalamin, which in lozenge form is known by its registered trade name, PreHistin®.   Much of the time since July 2004 the debtor has been occupied with either or both of attempting to bring PreHistin® beyond its earliest development stage and raising money to accomplish this.  This has included three phase III trials of PreHistin® at over 31 clinics with 2,300 patients.

Debtor is a publicly-traded company although it is not currently in compliance with SEC regulations.  It expects to come into compliance by about September of this year.  Reportedly, something like $25,000,000 has been raised (and spent) by debtor since its inception, mostly through consecutive issuances of stock to reportedly accredited investors.  There were 50,865,128 shares outstanding as of March 2008.  Reportedly, about 30% of these are now owned by one person, Chaim Stern, a wealthy New York investor.  There are various charges by YA Global that both debtor and Mr. Stern have violated securities regulations in failing to make certain required SEC filings.  For purposes of this confirmation hearing only and without in any way condoning any such alleged violations, the Court does not delve into whether these

charges are correct.  This is because no credible argument is offered that any such violations, even if true, will likely lead to immediate SEC enforcement actions or other action that would threaten the viability of debtor.

In December 2006, debtor entered into a secured financing arrangement with a hedge fund, Cornell Capital Partners, L.P., now known as YA Global.  This transaction was through a form of convertible debenture commonly known as a PIPE (private investment in public equity). The transaction involved up to a $3,850,000 borrowing by the debtor, $2.5 million disbursed upon closing with two additional installments of $675,000, the first payable after the filing of debtor's registration statement with the SEC and the second after the registration was declared effective.  These borrowings would bear interest at 8% per annum, and each disbursement was debited by a 10% commitment fee.  With other fees there was a total debit of about $415,000 in fees.  A security agreement was signed giving YA Global a security interest in substantially all of debtor's assets, including the PreHistin® patent.  The security interest was perfected by a UCC-1 filing in Nevada and with the U.S. Patent Office.  Under a series of agreements between the parties, YA Global could convert debt to shares in the debtor at a conversion price equal to the lesser of $.9955 or 90% of the average of the three lowest daily volume weighted average prices of the stock in the 15 days preceding the trade.  As additional security there was also a Pledge and Escrow Agreement from members of the Radovich family of their 8,400,000 shares in the debtor.  The certificates are reportedly in the possession of Mr. David Gonzalez, general counsel for YA Global, as escrow agent under this Pledge and Escrow Agreement.  About $1,240,000 of the claim has been converted into debtor's stock.

Although over $3.8 million was borrowed, Debtor disputes that *any* sum is owed to YA Global by reason of alleged offsets for breaches of the agreements, including concerning

alleged improper shorting of the stock, and other alleged securities law violations which are the

subject of an adversary proceeding brought in November 2009 against YA Global by the

debtor, case no. 8:09-ap-01705-TA.  It is unnecessary to discuss the details of this dispute

except to say that the Court considered the issues at length in its "Statement of Decision

Regarding Estimation of YA Global Investments, L.P.'s Claim" entered herein March 19, 2010.

In that decision, the Court estimated YA Global's claim for voting purposes under FRBP

3018(a), and estimated the secured portion thereof under FRBP 3012, resulting in a

$1,500,000 secured claim and a $1,089,626[2] unsecured claim for purposes of these plan

confirmations.

In about April 2007, after an agreed moratorium of one year, another hedge fund,

Gryphon Master Fund, began attempts to levy upon a judgment it held for approximately $1.6

million.  On May 31, 2007, the debtor announced a delay in the reporting of its Phase III trial,

and on July 6, 2007, the long–awaited Phase III trial was announced by the FDA to be

"inconclusive."  After each of these announcements there was an immediate decline in the

price of the stock.  To make matters worse, Gryphon obtained a turnover order from the U.S.

District Court in aid of its judgment in late July 2007. YA Global filed this case as an involuntary

Chapter 7 petition August 1, 2007, apparently with concurrence of debtor's management, to

invoke the automatic stay and so to avoid immediate levies by Gryphon.  On October 12, 2007,

there was a stipulation to an order for relief and on November 16, 2007, a conversion to

Chapter 11. The case sat largely idle for most of the remainder of 2007 and all of 2008, and

there have since been several hearings on YA Global's motion for conversion of the case from

---

[2]   The unsecured portion is subject to adjustment depending on whether any portion of
claimed fees and interest accrued *before* the date of the petition, since under 11 U.S.C.
§506(b) no interest or fees can accrue post petition unless supported by collateral value and
the value has been estimated to be only $1.5 million.

Chapter 11 to 7.  There have been three successive sets of debtor's counsel.  Numerous sets

of projections of future sales have been issued by debtor, starting in October 2008, but none of

which have been even nearly met.  In fact, to the date of the confirmation hearing, there has

never been more than a few thousand in sales of PreHistin® in any month, although as of

February 2010 over $1,024.000 has been received by debtor post petition, primarily from yet

further issuance of stock.  The Court announced a final deadline for confirmation in April 2010

and so these confirmation motions were heard virtually at the last possible time within that

deadline. Reportedly, debtor's long-delayed advertisement campaign, including a television

commercial, was initiated just as the confirmation motions were heard.


### 2.  The Rival Plans

 By stipulation and order, YA Global and the debtor in early 2010 proposed their

respective plans of reorganization and utilized a Joint Disclosure Statement.  The respective

plans can be summarized as follows:

**Debtor's Plan**: All classes will be paid in full on their allowed claims with interest,

fully amortized over a five year term in monthly installments.  Interest on YA Global's secured

claim will be at the rate of 4% (later raised to 6.5%) and upon the unsecured classes, including

YA Global's deficiency claim, at the rate of 3% (later reduced to 2.64%).  Debtor reserves its

objections to allowance of disputed claims, including YA Global's.  Until disputed claims are

resolved, payments due are paid into an escrow on the same schedule.  Notably, in both

cases, debtor's plan provides that the interest rate may be at the rates given "or as ordered by

the court." Existing shares in debtor are preserved and management is mostly the same. YA

Global's lien is preserved but no prohibition against junior liens appears.  However, it is

provided at page 7 of the plan that upon default, after a 10-day grace period and opportunity to cure, YA Global may immediately resort to its collateral without further stay.

**YA Global's Plan:** The technology will presumably be foreclosed upon by YA Global and then licensed or conveyed to a subsidiary, InterActive Nutrition, an established Canadian company in the nutritional supplements business, through a new entity to be established, Newco.  The license will require that Newco receive 25% of InterActive's earnings for a period of three years (later increased to 100%) which is projected to be about $200,000 per annum.  These projected royalties would result in an approximate 4% to 15% return (presumably more since the percentage of dividend was later increased) on claims. YA Global would not participate on account of its unsecured deficiency claim.  Existing shareholders of the debtor would be eliminated.

Both plans call for payment of all allowed administrative claims and priority claims.

According to the Plan Ballot Summaries, debtor's plan received the requisite percentages to achieve acceptance in impaired classes 3 [Gryphon], Class 4 [general unsecured] and Class 6 [convenience class].  Rejections were received from the two YA Global classes only, Class 2 [secured claim] and 5 [deficiency].  All other classes are unimpaired.  YA Global received requisite percentages in its Class 2 [its own secured claim] and Class 4[convenience class] only.  Unlike debtor, YA Global did not separately classify its own deficiency or Gryphon's claim[3], but included these within general unsecured claims in Class 3.  However, the strong majority of the unsecured class and well more than 50% in dollar amount rejected YA Global's plan, even considering that its own deficiency claim was included.

---

[3]  Gryphon was described by debtor as a disputed secured claim, but it develops that its claim of lien is probably junior to YA Global's and thus, effectively, unsecured.  Its claim of lien may also be preferential.  YA Global seems to merely assume the characterization as unsecured without benefit of court order determining this issue.  For reasons explained in the body of this decision, the resolution of this question probably does not matter at this time.

Of course, Class 5, the shareholders, were deemed to have rejected the YA Global plan.

Since both sides claim acceptance by at least one impaired class not including insiders as

required by 11 U.S.C. § 1129(a)(10), and both claim that all § 1129(a) conditions to

confirmation are fulfilled except (a)(8)[acceptance by all impaired classes], both sides seek

confirmation under the cramdown  provisions found in 11 U.S.C. § 1129(b).

As the Court made clear at the confirmation hearing, <u>if</u> debtor's plan is confirmable then

it alone should receive the confirmation order as instructed by 11 U.S.C. §1129(c) since it

alone provides something for the shareholders and, as well, it is supported by a much wider

margin of the unsecured creditors.


### 3.  Requirements of Confirmation

There are, however, several elements that debtor must prove in order to achieve

confirmation.  YA Global has objected on grounds that debtor's plan is not feasible, the plan is

not proposed in good faith, the treatment of classes of both secured and unsecured claims is

not "fair and equitable," the plan unfairly discriminates against YA Global's deficiency claim,

the plan has not been accepted by an impaired class and the plan violates § 1129(a)(5). The

Court discusses each of these below, in reverse order:


### A.  List of Officers and Directors: § 1129(a)(5)

Section 1129(a)(5)(A) provides that the proponent of a plan must disclose the identity

and affiliation of any individual designated to serve as director, officer, or voting trustee of the

debtor, and that appointment or continuance in office is consistent with the interests of

creditors and equity, as well as with public policy.  YA Global's point seems to be that there is

a discrepancy between what the plan says about officers post confirmation, and what Chas

Radovich, debtor's CEO, said in his deposition.  YA Global also argues that Mr. Tejeda is not

qualified to serve as a treasurer, given his recent employment background.  The plan is

actually silent on the issue of post petition officers and directors.  However, the Joint

Disclosure Statement provides at page 35 that Mr. Radovich will continue as CEO and Mr.

Armstrong as Chief Scientific Officer at stated rates of compensation, and further that "The

Debtor does not anticipate any changes from existing management although it reserves the

right to do so."   The Joint Disclosure Statement at page 10 gives the list of current officers and

directors.  The Court sees no basis on this ground to deny confirmation.  The Court does not

read this provision to be some sort of basis for the Court's arbitrary second guess on debtor's

selection of its officers and directors; rather, the point seems to be that *manifestly

inappropriate* officers should not serve in reorganized debtors where inconsistent with the

interest of creditors, equity security holders or public policy.  The Court reads this to allow the

Court the ability to exclude perhaps the dishonest and the grossly incompetent, s*ee* 7 Collier

on Bankruptcy , ¶1129.02[5][b] (16th ed. 2009), but there is no showing that such a concern

applies here.  Moreover, that debtor might in future contemplate subtractions or additions to

this list is not a barrier to confirmation. *See In re American Solar King Corp.*, 90 B.R. 808, 815

(Bankr. W.D.Tex. 1988).


**B.  Acceptance by an Impaired Class and Separate Classification: §1129(a)(10)**

YA Global argues that debtor cannot count Gryphon, which was subject to a pending

objection, and therefore is not yet allowed under § 502(a) and (d) as of the voting date, thereby

making it ineligible to vote and by definition keeping Class 3 from consenting.  Further, it is

argued that Class 4 [general unsecureds] must include YA Global's deficiency of at least

$1,089,626.[4]  If the $1,089,626 is added to Class 4 as a negative, then the 66.66% of dollars

voting threshold found at § 1126(c) is not met for Class 4.  Lastly, the convenience class,

Class 6, YA Global argues, is not legitimately an impaired class for cramdown purposes. *See

In re Willows Convalescent Ctrs. Ltd. P'ship,* 151 B.R. 220, 223-24 (D. Minn. 1991).

It is not necessary to decide the Class 3 and 6 issues <u>if</u> the Court determines that YA

Global's deficiency was legitimately classified in Class 5 separately from other unsecured

creditors in Class 4, because only one consenting, impaired class is needed and, in that event,

Class 4 would qualify.  YA Global argues that there was no legitimate reason for the separate

classification other than to gerrymander the vote.  If this is the *only* purpose for the

classification, Ninth Circuit courts have uniformly condemned this as an improper subterfuge

and a violation of § 1122.  *See, e.g,. Barakat v. Life Ins.. Co. of Va. (In re Barakat)*, 99 F. 3d

1520, 1526 (9th Cir. 1996); *Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-

Storage)*, 166 B.R. 892, 897 (B.A.P. 9th Cir. 1994).

The debtor cites *Steelcase, Inc. v. Johnston (In re Johnston)*, 21 F.3d 323 (9th Cir.

1994) for the proposition that where the debtor can articulate legitimate business reasons for

the separate classification, such that the character and nature of the claim is different from

other claims in the class, separate classification can be upheld. In *Johnston*, the major creditor,

Steelcase, was a partially secured creditor as to an affiliate debtor, COS, and based its claim

against the debtor on his guaranty of products sold to COS.  Steelcase was also the subject of

litigation brought by both the debtor and COS, and Steelcase brought counterclaims.  The

Ninth Circuit found that the bankruptcy court's confirmation of the plan over Steelcase's

---

[4]  This amount is subject to increase depending on whether any of the reported interest and
fees accrued pre-petition.

objection on the classification issue was not clearly erroneous.  Clearly, Steelcase because of

its collateral and litigation stood the possibility of being paid ahead of other unsecured

creditors, and, conversely, the creditor's claim was potentially exceeded by the debtor's own

claim against it.  Thus, the bankruptcy court was not clearly erroneous in its finding of fact that

Steelcase's claim was of a different legal character from that of the other unsecured creditors,

meriting separate classification. *Id.* at 326-28.   Indeed, the Ninth Circuit in *Barakat* observed

as much in its own discussion of *Johnston*, and observed that had any such special

circumstances been applicable to the debtor's attempt to separately classify in *Barakat*, the

attempted separate classification might have been upheld.  *Barakat*, 99 F.3d at 1526.

However, since the debtor in *Barakat* offered no similar business or economic justification, the

*Barakat* court concluded that the separate classification was nothing more than an

impermissible attempt to gerrymander the vote.  *Id.*

Debtor argues at least two possibly legitimate reasons for the separate classification

that are more like *Johnston* and less like *Barakat*.  First, like *Johnston* but unlike *Barakat*, the

parties are embroiled in contentious litigation.  Even though the Court has discounted the

litigation threat on a temporary basis for voting purposes, if debtor prevails, it is conceivable

that no amount would be owed YA Global and this could be determined well in advance of the

payment schedule facing all others.  Also, unlike any other creditor, YA Global holds a pledge

of debtor's stock owned by the Radovich family.  While this may or may not make a practical

difference in recovery, assuming at least some degree of success the deficiency claim of YA

Global stands at least the possibility of being paid in full as an effectively secured claim, if not

from debtor's assets then from the pledged stock.  In response to this last point, YA Global

argues that the guaranty should be of no consequence since the focus should be *only on the*

*relationship of the claim to the debtor's assets*, i.e., so long as YA Global's deficiency claim is

of like priority and equally payable from debtor's assets, there should be no basis for a

separate classification only because the claim may have some ancillary source of recovery.

*See, e.g.*, *In re Heron, Burchette, Ruckert & Rothwell,* 148 B.R. 660, 670 (Bankr. D.D.C. 1992);

*In re Los Angeles Land & Inv.,* 282 F. Supp. 448, 453-54 (D. Haw. 1968), *aff'd* 447 F. 2d 1366

(9th Cir. 1971).

The Court is not persuaded by the *Los Angeles Land* authority, at least in part because

it predates the Code and the seminal cases that have explored these issues.  *Heron,*

*Burchette,* in contrast, cites to one of the important seminal cases on the subject of

classification, *In re Greystone III Joint Venture*, 995 F. 2d 1274, 1279 (5th Cir. 1991) *cert.*

*denied sub. Nom,*  506 U.S. 821.  *Greystone* has also been cited by both the *Tucson Self*

*Storage* and *Barakat* courts, as well as many others. *Greystone* appears to set up a rule,

followed in the Ninth Circuit, that the Court will inquire concerning whether the proffered

motivations for the separate classification are genuine and legally cognizable, or are instead a

mask for the true motive of gerrymandering a consenting class. *Greystone*, 995 F. 2d at 1279-

81; *Barakat,* 99 F. 3d at 1526; *Tucson Self Storage* 166 B.R. at 897.  The Court does not see

the emphasis as in *Heron, Burchette* on the narrower question of the relationship of the

separately classified claim to debtor's assets.  But even giving some weight to the notion that

valid distinctions should only be in the nature of the claimant's access to the debtor's assets,

and not to ancillary sources, the Court is still unconvinced.  While it is true that access to

pledged shares of the debtor for payment of claims is not legally the same thing as access to

its assets, there is no doubt that in practical terms YA Global's leverage by reason of the

Pledge and Escrow Agreement is vastly magnified over that of other claimants and in some

ways it is like access to non-debtor collateral.  Chas Radovich, the CEO, is the prime mover of

debtor, no doubt, and his family's stake in the upside of this venture is pledged in the hands of

YA Global.  If for no other reason, it would seem that the very last creditor that the Radovich

family ever wants to experience a default is YA Global.  If the projections are not met and

available cash proves tight, one supposes that the YA Global classes stand a superior chance

of being the last to see a default.  However, the Court recognizes that courts in other circuits

have held that recourse to non-debtor property, such as through a guaranty, is not alone a

legitimate basis for separate classification.  *See, e.g., Thornwood Assocs. v. Greater N.Y. Sav.

Bank* (*In re Thornwood Associates*), 162 B.R. 438, 441 (Bankr. M.D. Pa. 1993) (*citing, John

Hancock Mutual Life Insur. Co. v. Route 37 Business Park Associates*, 987 F. 2d 154, 157 (3d

Cir. 1993)).

But the litigation between the parties, *when added to the pledge issue*, is in the Court's

view sufficient to justify separate classification.  YA Global argues that this is disingenuous

because other claimants subject to litigation, such as Mr. Luce, are not similarly separately

classified.  But neither *Johnston* nor any other authority holds for the proposition that *every*

creditor who bears some of the same characteristics as the separately classified creditor *must

similarly be separately classified*.  This is an aggressive gloss upon § 1122 and cases like

*Johnston,* that seems unsupported by any logic, precedent or reason.  Section 1122(a)

requires only that all creditors classified together must be alike, not that all alike creditors must

be in the same class. While it is true that **one** of the principal reasons that the *Johnston* court

found the litigation significant was the prospect that the creditor might, by reason of its cross

suit, achieve payment earlier than others, this was not selected (despite YA Global's

argument) as the only reason for the litigation's importance.  Indeed, the *Barakat* court in its

discussion of *Johnston* listed this as *only one* of several such reasons, and referenced the

debtor's litigation claim back against the creditor as of like importance:

> *Johnston,* however, is distinguishable. The court found that the
> creditor in *Johnston* was embroiled in litigation with the debtor
> regarding issues unrelated to the bankruptcy, that, if successful,
> would have fully paid the creditor's claim before all other unsecured
> creditors. **Further, the creditor's claim was potentially exceeded
> by the debtor's own claim against the creditor and subject to
> offset.** Finally, the creditor's claim was partially secured by a
> security interest in other property.  Thus, the court concluded, the
> bankruptcy court did not clearly err in finding that the creditor held a
> different legal status from that of the other unsecured claimants.

*Barakat*, 99 F. 3d at 1526, *citing Johnston,* 21 F. 3d at 326-28 (emphasis added).  Based on

this quoted language it would seem that debtor's claim back against YA Global might be some

justification for the separate classification, just like in *Johnston*.  The *Barakat* court noted as

also valid the fact that the creditor in *Johnston* held a claim "partially secured by a security

interest in other property."  *Barakat*, 99 F.3d at 1526.  As noted, a security interest in non-

debtor property is not the same as a guaranty or access to the Radovich stock under the

Pledge and Escrow Agreement, but the Court is not persuaded that this distinction is entirely

determinative such that the pledge of the stock should be given no weight.  As is noted in

several of the cases, the law on classification is somewhat muddled, and the only theme that

emerges uniformly is that the plan proponent cannot separately classify *solely* to gerrymander

the vote. "Business justification" of some kind must be established. Since no proponent will

likely admit to a gerrymandering motive (even if there is at least partially such motive), in

practical terms we are taught by *Barakat, Johnston, Tucson, Greystone* and similar authority

that the proponent bears the burden of establishing that there is "business justification" behind

the classification, but that once that is shown the Court has discretion to accept that separate

classification as an issue of fact determinable on a case by case basis.[5] *Cf. In re Palisades-On-The Desplaines*, 89 F. 2d 214, 217 (7th Cir. 1937) [wide latitude afforded on classification]. The Court finds that the separate classification of YA Global's deficiency into Class 5 is supported by an economic or business justification sufficient to pass muster here.  Therefore, Class 4 can serve as the needed consenting, impaired class under 11 U.S.C. § 1129(a)(10).

## C.  Unfair Discrimination: § 1129(b)(1)

YA Global does not really articulate a basis for its argument that debtor's plan discriminates unfairly against it other than the separate classification issue. In fact, it would appear that treatment of YA Global's unsecured deficiency is identical to that of the general unsecured creditors.

## D. Fair and Equitable: § 1129(b)(2)(A) and (B)

To be eligible for cramdown the plan must be "fair and equitable" respecting non-consenting classes.  "Fair and equitable" is defined at § 1129(b)(2) to require certain minimum treatment regarding both classes of secured claims, under subsection (b)(2)(A), and regarding classes of unsecured claims at subsection (b)(2)(B).  Since YA Global holds a claim in both a secured class [Class 2] and in an unsecured class [Class 5], it is necessary to review whether the minimum standards are met here.

Respecting a class of secured claims, the plan is "fair and equitable" if the claimant retains its lien and if deferred cash payments are received "totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such

---

[5]  That is, the court is not "clearly erroneous" in accepting the classification.  *Johnston*, 21 F. 3d at 326-28.

holder's interest…" in the secured creditor's collateral. 11 U.S.C. § 1129(b)(2)(A)(i)(I) and (II).

The plan clearly provides that YA Global retains its lien. But a question has been raised as to

whether the promised payments amortizing over a five year period at an interest rate of 6.5%

are sufficient to yield a "present value" equal to the existing value of YA Global's collateral,

which has been determined to be $1.5 million.[6]    Fortunately for debtor, its plan is phrased

such that the interest rate is actually "6.5% *or as ordered by the court.*" (emphasis added)  This

was a prudent precaution as the Court does not believe that 6.5% is even close to a rate

sufficient to provide "present value," for the reasons below.

In order to make sense of this portion of the "fair and equitable" standard, it is necessary

to have at least a basic understanding of economics.  It is beyond dispute that a promise of a

dollar on Tuesday[7] is worth less than a dollar in hand today. In order to equalize these values,

we commonly speak of "interest" as the amount of additional payment such that the lender is

(or should be) at least indifferent between the two situations.  Since, in a sense, a cramdown is

like an involuntary loan imposed upon the non-consenting lender, it becomes necessary to

determine what the minimum interest rate is to reach that theoretical equilibrium. Although the

Code speaks in terms of "present value" there is no question that this is a question of the time

value of money and what the court must find is the appropriate interest rate which, when

added to principal in a stream of payments, will yield a present value equal to the value of the

secured claim.  7 <u>Collier on Bankruptcy</u>, ¶1129.05[2] at 1129-143 n. 26 (16th ed. 2009).  Of

---

[6]  The Court determined this value upon motion of the debtor under FRBP 3012 by its decision
entered March 19, 2010.

[7]  With apologies to Wimpy of the Popeye comic strips who is reported to have promised: "I will
gladly pay you Tuesday for a hamburger today." Fred Shapiro, <u>The Yale Book of Quotations</u>
677 (Yale University Press (2009). Another expression of the same concept is: "TVM [Time
Value of Money] is based on the concept that money received earlier is worth more than the
same amount of money received later, because it can be 'employed' to earn interest over
time…"Available at www.businessdictionary.com/definition/time-value-of-money-TVM.html

course, interest rates must reflect risks inherent in the transaction, which are risks both as to

default and as to changes in the cost of money.  Loans to shaky borrowers are obviously more

expensive than ones to strong borrowers; that is why most unsecured (and sometimes

secured) commercial loans are often expressed in terms of a "prime rate."  "Prime" is reserved

for the very strongest borrowers, whose balance sheets and track record suggest little risk of

default, as the following definition suggests:

> [Prime rate is a] base rate that banks use in pricing commercial
> loans to their best and most creditworthy customers. The rate is
> determined by the Federal Reserve's decision to raise or lower
> prevailing interest rates for short-term borrowing. Though some
> banks charge their best customers more and some less than the
> official prime rate, the rate tends to become standard across the
> banking industry when a major bank moves its prime up or down.
> The rate    is a key interest rate, since loans to less-creditworthy
> customers are often tied to the prime    rate. For example, a Blue
> Chip company may borrow at a prime rate of 5%, but a less-well-
> established small business may borrow from the same bank at
> prime plus 2, or 7%....

John Downes and Jordan Elliot Goodman, Dictionary of Finance and Investment Terms, 538

(Barron's Ed. Series, Inc. ed., 7th ed. 2006).  Obviously, then, additional basis points are

added to "prime" to reflect perceptions of risk.  The "prime rate" is currently reported as 3.25%

per annum.  But lenders also run a risk that the cost of money generally will increase as it often

does in inflationary periods, and the longer the term of the loan the greater that risk.  That is

why most commercial loans are expressed in terms of an adjustable or variable index, as the

following definition suggests:

> A variable rate is an interest rate that may fluctuate over time. To
> determine its variable rate, a      lender first chooses an interest
> rate such as the prime rate, the 1-, 3-, or 6-month Treasury Billrate,
> or the fed funds rate as an index to which the variable rate will be
> tied. Next the lender adds  a  certain  number  of  percentage  points
> (called   a   margin,   which   varies   from   borrower-to-borrower
> depending in part on credit standing) on to the index rate, and that

> sum is the variable rate. Some lenders multiply the index or the index plus the margin by a set number to generate the variable rate. *Opposite to a fixed rate, a variable rate should be lower initially than a fixed rate because of the interest-rate risk inherent in a variable rate (the risk is that a variable rate can increase).* Examples of loans that typically carry a variable rate include credit cards, adjustable mortgages, and home equity lines of credit.

Investor Glossary available at http://www.investorglossary.com/variable-rate.htm (emphasis added).  As the above suggests, a fixed rate adds risk to the lender because it may find itself unable to adjust rates in an inflationary period thus running the added risk of losing money on a comparative basis; that is why fixed rate loans are invariably quoted as higher than adjustable ones because the lender charges a compensatory risk premium.  Debtor proposes here to cram down at a *fixed rate* for a period of five years, so the risk premium for this must be acknowledged.

It may be incorrect to speak of "market rates" because, by definition, in a cramdown like this one there is no "market" to which the debtor could successfully turn (or presumably it would have done so).  This must be especially so for a 100% loan-to-value loan made to a Chapter 11 debtor without any demonstrated business track record.  But the law must attempt some approximation lest all such Chapter 11s involving promises of future payments fail. Instead, the law searches for a "proxy" in lieu of a market which usually involves selecting a risk-free or nearly risk free rate such as U.S. Treasuries or the prime rate, and then building up a rate by adding basis points to account for the unique issues of risk present in the subject transaction.  This is sometimes called a "formula" approach.  *Till v. SCS Credit Corp.*, 541 U.S. 465, 479-80, 124 S. Ct. 1951, 1961 (2004).  The *Till* court endorsed the formula approach but did not specifically decide the appropriate "scale for the risk adjustment" beyond noting that some courts had adopted a 1-3% over prime adjustment.  *Id.* at 480.   *Till* held that the court is

to attempt to fashion a rate that compensates for the risks both of the cost of money and the

risk of default, by noting such issues as nature of the security and duration and feasibility of the

plan. *Id.* at 479.  The *Till* court did acknowledge that adopting too high a rate might render a

plan infeasible, but noted that the remedy in such a case was to simply deny confirmation on

the grounds of feasibility. *Id.* at 480-81.   This does not suggest to the Court that *Till* stands for

the proposition that the debtor gets away with an unreasonable discount if the indicated

cramdown rate is more than 3 over prime, or that dissenting creditors can be made to shoulder

uncompensated risk; rather, this is merely an acknowledgement that the issue of feasibility and

cramdown interest rates are closely intertwined.  Although it is unclear to what extent *Till*

governs in Chapter 11s,[8] the Court agrees that it is necessary to adopt some kind of a formula

approach in order to approximate the compensation for the risks that are proposed to be

imposed upon YA Global.  Whatever implication could be drawn from the *Till* discussion of a

possible 1-3% over the prime rate is tenuous at best in this case.  First, there is a world of

difference between the collateral in *Till* (a truck) and the collateral in the case at bench.  A

used truck has a readily ascertainable range of values, depending on model year and

condition; there are publications of the values which are universally available to the buying and

selling communities. In other words, if things don't go as planned in such a case the lender has

reasonable assurance that there will be *something* of value to look to at the end of the day.

Not so in this case.  PreHistin® has only the most speculative of values and, as even the

---

[8]  At its footnote 14, the *Till* court notes that in Chapter 11, in contrast to Chapter 13, there
might exist a true market by reference to various lenders specializing in DIP loans.  But the
kinds of loans referenced are usually ones bankable early in the case using some traditional
criteria concerning collateral value and demonstrated payment ability, not so much on the kind
of issues confronting us in this cramdown.  In the context at bench, we are asked to make
sense of present value and interest rate concepts at the extreme, well beyond what any
sensible lender would do on a consensual basis.

debtor's expert acknowledges, the chances are about one in three that in a few years there will be nothing of value at all.

On the appropriate cramdown interest rate for debtor's plan we have little help from YA Global's expert, John Russell, who merely opines that the plan is not feasible at all because he does not believe that the debtor can achieve *any* of its aggressive sales projections which he calls universally unreliable.  However, at ¶¶ 26-27 in his "Declaration of Expert Witness John Russell in Support of YA Global Investments L.P.'s Opposition to Debtor's Motion for Order Valuing Secured Claim," which was appended as Exhibit 1 to his declaration for the confirmation hearing, Mr. Russell offers some opinions regarding discount rates to be used in a discounted cash flow method of valuation in appraising the value of the technology, which may have *some* bearing, for reasons discussed below.

Debtor offers the expert testimony of Nathan Johnson of Gemini Partners whose report was received in evidence [Exhibit "O"].   Mr. Johnson offers an opinion that the appropriate cramdown interest rate for a hypothetical loan for a 5-year term collateralized only by the debtor's IP (such as is YA Global's position under the plan) should be between 6.5 and 7%.

The Court did not find Mr. Johnson's opinion at all persuasive for the following reasons. First, he attempts to extrapolate a cramdown rate by viewing the yield rates on 100 speculative bond issues, including current and defaulted bonds, and cash-pay and zero-coupon bonds.  As of January 28, 2010 the average rate for those surveyed was reported as 8.23%, citing the KDP High Yield Daily Index available at http://www.kdpyield.com/dayindex.cfm.  But this is not an apt comparison.  This list of bonds includes many large and established companies[9] with at

---

[9]  The Court checked the same index on March 31, 2010.  The bonds were issued by such companies as Tenet Healthcare, Royal Caribbean, Toys R Us, Rite Aid Corp., Chiquita Brands and similar companies with well-known names. While this may not be a list of model

least track records. In contrast, debtor has no sales track record at all except failure.   Next, Mr. Johnson attempts some kind of a comparison to several listed pharmaceutical companies whose "Drug Patent Royalty Securitizations" have been publicly rated.  These are rated between "not rated" for two on the list, "Aaa" for three and "Baa2" for one.  But no explanation is offered as to why these ratings have anything at all to do with debtor.  Moreover, the companies listed are large, established companies and the securitization offerings range from $60 million to $1.4 billion.  Any remote implication for the PreHistin® product, or the start-up debtor, is simply not explained, and the Court cannot imagine that a security offering of debtor could be rated *on any basis* by any recognized service such as Moody's or Standard & Poor's. Moreover, Mr. Johnson recognizes that those ratings were for FDA approved drugs, not an unproven nutraceutical like PreHistin®.  However, even assuming that there should be some comparison of these much larger offerings to debtor, how the listed ratings tie to anything like an interest rate is similarly left unexplained.

Mr. Johnson does offer one opinion that the court believes has *some* bearing on the issue.  He attempted to value the IP in connection with debtor's motion to value YA Global's secured claim under FRBP 3012 and submitted a "Fair Value Estimate and Interest Rate Analysis" dated January 28, 2010 in support of that effort filed February 19, 2010 ("Report"). Mr. Johnson opines in the Report that he should not utilize a traditional discounted cash flow analysis in determining value of the IP because the debtor's projections were "unobservable," but he would nevertheless use a form of the income approach to valuation called "Relief from Royalty" method which still imports a discounted cash flow analysis.  Thus, Mr. Johnson still relies in part on the debtor's cash flow projections, but to make up, apparently, for the grossly

companies, still there must be more substance than one can ascribe to a start-up like the debtor.

optimistic projections, he assigned a discount rate between 30-35%.  Report p. 19.  In Gemini

Partners' 2004 report on the same subject, based on earlier projections, he offered that the

discount rate would be 25%. Exhibit "9" at p. 16. The higher the discount rate, the lower is the

resulting value. Moreover, the discount rate is (or should be) the reverse image of the interest

rate, i.e. to arrive at a present value rather than a future value.  Present value is inversely

proportional to the discount rate – reducing the discount rate increases present value.  So, the

sum of the future stream of payments including a designated interest rate should, if the same

rate is applied as a discount rate, come back exactly to the starting point, which under

cramdown must be equal to the value of the collateral as of the effective date of the plan. *See*

Reehl and Milner, *"Cram-Down Interest Rates: The Quest Continues"*, 30 Cal. Bankr. J.,Vol.

No.1, page 15, 17 (2009); 7 Collier on Bankruptcy ¶1129.05[2][b] (16th ed. 2009).  Just as

obviously, if too low an interest rate is applied, a higher discount rate applied to the resulting

stream of payments will result in a value less than the creditor's secured claim and will show

that the interest rate is violative of 11 U.S.C. §1129(b) (2)(A)(i)(II). *Id.*

The Court recognizes that Mr. Johnson has attempted to explain how a discount rate

between 30-35% can be reconciled with an interest rate of only 6.5-7%.  Return rates like 30%

are generally associated with speculative equity deals, not loans.[10] Mr. Johnson tries to justify

the discrepancy by referencing YA Global's access to its collateral or ancillary rights such as

warrants, etc., as mitigating its risk. *See* Deposition of Nathan R. Johnson February 12, 2010,

pp. 152-55.  The explanation is largely unconvincing for the simple reason that the patent to

PreHistin® *is* the company, and projected cash flows are all that matters, as the following

dialogue from the Mr. Johnson's deposition makes clear:

---

[10] See note 12, *infra.*

Q. In other words, either you are going to get paid back your debt- -
A. Uh-huh.
Q. –in the ordinary course or, if it doesn't work, you are not really going to have any collateral        because  we  just  went  through this and the collateral is worthless.
A.  All right.
Q.  Those are your two options.  This is not the scenario where, if the  company  doesn't  generate  cash  flows  to  pay  in  the  ordinary course,  you'll  really  have  collateral  at  the  end  because—you understand that in this hypothetical—
A. Un-huh.
Q. –in this bankruptcy case, if the cash flows don't occur, we all— we all agree, right, that the collateral is worthless?
A. Absolutely.  I mean, let's be honest, in a scenario like that, the reality is, as much as you're        investing in a debt debenture of a company  that's  not  generating  cash  flow,  the  reality  is  you  are actually investing in equity.  You are.
Q. Yeah.
A.  Those are equity dollars going in.
Q.  Those are equity dollars going in because there's—even though you are secured and you have     a first lien—
A. Right.
Q.—it's on an asset that wouldn't be there in ten years; right?
A. Right.
Q. And either you get paid in full through the cash flows or your collateral will be gone?
A. Yeah. Correct.
Q.  So, in that hypothetical, do you see any difference between that hypothetical and the case that we have before us?
A.  No. I mean, that's—essentially, the case that you've outlined is what the company is going        through right now….

Johnson deposition, pp. 154-56. Stated another way, from a practical standpoint whether the

investment into debtor or PreHistin® is characterized as a loan or in equity scarcely matters.  If

the product is not accepted and the huge sales projected do not materialize, taking back the

patent through foreclosure (depending on when this occurs) is not going to matter much

because the intangible value will have been largely if not totally discredited.  This is not to say

that an investment into a start-up like debtor is not a good investment; it might well be.  But

that is not what is is proposed.  Through cramdown the debtor is proposing that *YA Global* be

forced to make that investment *as a loan with loan-like returns*.  As explained in *In re Sparks,*

171 B.R. 860 (Bankr. N.D. Ill 1994):

> On balance, that evidence demonstrates that the [the investment]
> would have a reasonable chance of success.  Indeed, it would not
> be unreasonable to invest in such a project. The problem is that the
> Debtor is not proposing to invest in such a project. He is proposing
> that MetLife be forced to invest in such a project, and to accept that
> investment in lieu of its present rights as a secured creditor.   In
> order to achieve that end the Debtor had to prove, not merely that
> the risk is reasonable but that the risk to MetLife would not be
> increased by reason of the change in its collateral. The Debtor has
> not satisfied that burden.

*Id.* at 867. All of the available evidence suggests the future of PreHistin® and of debtor is

speculative; the upside is great but so is the downside.  The collateral is maybe worth

nothing[11]; such a case is fundamentally different from cases like *Till* where at least there is

some tangible collateral behind the cramdown loan, so if projections are not met and the

collateral is taken back, there is at least some durable value left to give the creditor a partial

recovery.  This mitigates risk.  But there is little mitigation of risk here.  Further, debtor's plan

proposes to *fix the interest rate*, so the risk of changes in the cost of money must also be

added.   In sum, an appropriate cramdown rate should probably be closer to what would be

expected in a venture capital equity deal, in the 35-50% range.[12]  Mr. Russell, YA Global's

expert, suggests he would have used a discount rate of 12% plus the addition of a 2.4%

adjustment for the "time value of money component" or a combined discount rate of 15%.

"Declaration of Expert Witness John Russell In Support of YA Global's Investments L.P.'s

---

[11]  Debtor's expert, Mr. Johnson in testimony pegged the chance at about one in three.

[12] Indeed, Mr. Johnson in coming up with his discount rate looked at the expected returns on
venture capital deals and found that investors have typically demanded rates of return in the
30%-50% range. Report at p. 19, citing Plummer "QED Report on Venture Capital Financial
Analysis" Palo Alto, QED Research 1987; Scherlis and Sahlman, "A Method for Valuing High-
Risk, Long Term Investments: The Venture Capital Method" Harvard Business School
Teaching Note 9-288-066, 1989.

Opposition to Debtor's Motion For Order Valuing Secured Claim" at ¶¶26-27, appended as

exhibit 1 to Declaration of Expert Witness John Russell In Support of Confirmation.  Frankly,

the Court sees this as generous to debtor.

There is only one provision of debtor's plan that the Court sees as offering *some*

meaningful risk mitigation for YA Global, thus justifying a downward adjustment from the most

speculative equity rates of the 30-35% range.  The plan provides that if any monthly

installment of principal and interest is missed after a ten day grace period YA Global may have

*immediate* recourse to its collateral.  This might mean that if the projections are not sufficiently

met, and promised infusions of capital are not forthcoming, such that a default occurs, YA

Global would have an early chance to take the IP back and attempt some re-use, hopefully in

time to extract some value before the efficacy of the product is discredited.  Considering also

that the contract rate of interest was 8%, albeit with many security remedies no longer

available here and in an environment before some of the negatives on PreHistin® were known,

and considering that YA Global's own expert would apparently have assigned a discount rate

in the 15% range, the Court finds that some downward adjustment is appropriate from the

stated venture capital equity standards. **Therefore, the Court finds that an appropriate**

**cramdown interest rate for this case in Class 2 is 20% per annum.**

YA Global has both a secured and an unsecured claim.  So the question becomes what

is the appropriate interest rate for the unsecured Class 5 claim?  Since existing equity is

retaining their interests, the only possibility for cramdown is found at § 1129(b)(2)(B)(i).  Debtor

dubiously argues that although the language as found in this section is virtually identical to that

discussed above regarding secured claims, minimum treatment of unsecured claims is

governed by different standards regarding present value.  Somehow, debtor argues, debtor

gets away with paying *less* interest, not more.  For the reasons discussed at length above, this is entirely illogical and cannot be the law.  If present value and interest concepts are tied to compensation of risk, then it logically follows that a claim without collateral is even riskier and so the interest rate should be correspondingly higher.  In defiance of this elementary precept, however, debtor cites two authorities to the contrary, *In re Rivers End Apartments, Ltd.*, 167 B.R. 470 (Bankr. S.D. Ohio 1994) and *In re Nite Light Inns,* 17 B.R. 367 (Bankr. S.D. Cal. 1982).  However, the Court believes these cases are probably wrong,[13] but are at least distinguishable or are not binding precedent for the following reasons.  *Rivers* involved a purchase of an unsecured claim during the pendency of the bankruptcy, so the *Rivers* court assumed that some determination regarding risk was already voluntarily made by the non-consenting creditor, who presumably bought at a discount.  The *Rivers* court then held that the "exposure or risk in this case relates only to the amount it paid for the note.  That factor means that [the creditor] has minimal exposure on its unsecured claim and, consequently, a lower discount rate than that applied to its secured claim is appropriate." *Id.* at 486.  While the Court disagrees with the logic of this holding,[14] it is unnecessary to resolve the point except to say this is factually distinguishable.  More problematic is *Nite Lite Inns*. The court in *Nite Lite Inns* determined that the rate used by the IRS on delinquent tax obligations found at 26 U.S.C. § 6621 should be "*prima facie* evidence of the appropriate discount factor to be used  to cram down a Chapter 11 plan on an unsecured creditor." *Id.* at 373  It could be said that the *Nite Lite Inns* court was simply unconvinced by the creditor's evidence and therefore adopted the 26

---

[13] For example, the *Rivers End* court at 167 B.R. at485 cites to *In re Westwood Plaza Apts.*, 147 B.R. 692, 702 (Bankr. E.D.Tex. 1992) for the proposition that secured creditors are entitled to higher interest rates than unsecured creditors in a cramdown.  The case was reversed on this very point in *In re Westwood PlazaApts.,* 192 B.R. 693, 697 (Dist. E.D. Tex. 1996).

[14]  The Code speaks in terms of providing present value *of claims*, not of present value of a creditor's basis *in the* claim or price paid for the claim.  The Court sees no basis for this kind of arbitrary departure from the plain language of the statute.

- 25

U.S.C. § 6621 rate as *prima facie* evidence of what the appropriate rate should be. There is little or no discussion in *Nite Lite Inns* as to the logical underpinnings for using the IRS rate as a cramdown rate except that it is easy and readily available, but the opinion leaves the door open to a showing by the non-consenting creditor that this rate does not reflect "then-existing economic conditions." *Id.* at 373.   *Nite Lite Inns* has not been cited by any other court on the issue of appropriate interest rates for cramdown. Many other authorities have declined to use 26 U.S.C.§ 6621 noting that it is not by itself an appropriate proxy for determining "present value" of a claim for confirmation purposes, but should at most be used in combination with other information  in evaluating terms, risk of default, etc. *See,e.g.., In re Camino Real Landscape Maintenance Contractors, Inc.*, 818 F. 2d 1503, 1506-07 (9th Cir. 1987).

In sum, the Court sees no basis for viewing the cramdown rate for unsecured classes any differently than for secured classes, except to note that the risk imposed is even higher because such creditors do not even have recourse to collateral in the event of default. Therefore, a present value analysis and elementary economics command that a dissenting unsecured class receive more, not less, than a secured class. *Department of Housing & Urban Dev. v. Westwood Plaza Apts.* (*In re Westwood Plaza Apartments, Ltd.*, 192 B.R. 693, 697 (Dist. E.D. Tex. 1996). However, under the unique facts of this case, where the intangible nature of the IP collateral is so inherently speculative, perhaps even ephemeral, the Court believes the adjustment between secured and unsecured status should be minor.  **Therefore, the Court finds that the appropriate cramdown interest rate for Class 5 is 21% per annum.**

### E.  Good Faith: § 1129(a)(3)

All plans to reach confirmation must be proposed in "good faith" but this is an elastic standard.  YA Global argues that debtor's plan is not in good faith because Mr. Radovich and management are attempting unreasonably to preserve the interests of existing equity instead of proposing something that would fairly compensate the claims of creditors. Implicit in this argument is that the values of PreHistin® and the projections are so speculative that debtor should simply acknowledge that there is nothing in this case for equity and that they are now, and have been for some time, "out of the money."  The Court is not persuaded that grossly optimistic is or should be the same thing as "bad faith."  One person's courage is another's foolishness. The truth is that but for the continuing optimism of management, $25 million would not have been raised and this product would likely never have come to market, except perhaps through takeover by YA Global.  Whether those investments in stock will develop to have been good investments or an expensive pipe dream remains to be seen.

YA Global argues about various lapses in SEC filings, irregularities regarding prepetition transfers to certain professionals, various serial issuances of stock post petition and about the purchase of the Gryphon claim by Mr. Olsen.  Some of these events may or may not have been improper, or may even smack of "gamesmanship," but they do not directly bear on the issue of whether this plan is proposed in good faith.  Impropriety concerning any of the referenced issues can and should be dealt with separately.  But the Court sees no basis on account of these for denial of confirmation on lack of good faith grounds.


### F.  Feasibility: § 1129(a)(11)

The Court addresses what is perhaps the most troublesome issue last.  Section

1129(a)(11) provides that a plan is only eligible for confirmation if the court determines that: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor ....unless such liquidation or reorganization is proposed in the plan."  This is construed as requiring a finding that the plan is "feasible."  As should be apparent from the above discussion, the Court has profound misgivings about the ability of debtor to repay the millions in debt that this 100% plan requires.  Since debtor has never in any month before the confirmation had sales of more than a few thousand, what should make us think that the latest "hockey stick" projections from debtor submitted at the confirmation hearing are any more trustworthy than the last four sets of projections?  This concern must be magnified now that the Court has also determined that cramdown interest rates on the YA Global two classes of claims must be 20 and 21% per annum, respectively.

"Feasibility" does not mean certainty.  The standard has been interpreted in the Ninth Circuit to mean that the plan has a "reasonable probability of success."  *In re Acequia, Inc.*, 787 F. 2d 1352, 1364-65 (9th Cir. 1986).  The "feasibility" standard has been interpreted as excluding "visionary schemes." *In re Pizza of Hawaii, Inc.*, 761 F. 2d. 1374, 1382 (9th Cir. 1985).  But, *possibility* of failure is not fatal.  *Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 651 (D. Md. 1998).  The issue is primarily one of fact so long as the debtor presents evidence that it can reasonably accomplish what is promised in the plan.  The Code does not require debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy §1129(a)(11) so long as adequate evidence supports a finding of feasibility. *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003), *citing In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or. 2002) and *In re Sagewood Manor Assocs. Ltd.*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998); *General Elec. Credit Equities, Inc. v. Brice*

*Road Dev. LLC (In re Brice Road Dev. LLC)*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008).

To prove feasibility debtor offers the declaration of and projections prepared by Martin Marion. Exhibit 12.  Mr. Marion is a senior marketing consultant to debtor with the majority of his 30 years' experience in the health care and pharmaceutical sectors.  Mr. Marion opines that once debtor's long-delayed marketing campaign gets started,[15] he predicts rapid penetration into various markets of PreHistin®.  Adopting what he characterizes as "conservative" assumptions, he predicts that through targeted media campaigns there will be rapid acceptance of Pre Histin®; he analyzes certain "cost-per-order-call" assumptions and he factors in other expenses to project  something like $627,000 net of expenses by the end of 2010[16], and over the five-year term of the plan cumulative profits of about $53,000,000.  The projections apparently account for professional fees incurred in the Chapter 11 and beyond, but do not account for debt service.  The projections apparently also do not specifically assume further capital contributions; however, since the operations are projected to result in negative bottom-line numbers for the first 10 months of operation (i.e. all revenues less all expenses, including professional fees), and cumulative losses through month six of about <$753,000>, it becomes obvious that debtor will need access to substantial new capital in the near term to sustain operations.  However, the Court finds that Mr. Marion's projections are otherwise reasonable, if somewhat optimistic.  What is clear, however, is that Mr. Marion realistically projects that the first year following the effective date as the most difficult.

Debtor presented the testimony of Chaim Stern through his "Declaration of Chaim Stern in Support of Confirmation…" which has his statement of financial position as of February 18,

---

[15] The marketing campaign was kicked off literally while the confirmation hearing was underway with a television commercial prepared by debtor released in targeted areas.
[16]  It is probably more appropriate to gauge this at about February 2011 since admittedly the debtor has had a late start (about two months) in commencing the marketing campaign.

2010 attached.  Mr. Stern is a wealthy investor from New York with a reported net worth of

$34,500,000, of which well over $3-4 million is liquid, according to his testimony. He also

enjoys net income of about $350,000 monthly, according to his testimony.  Mr. Stern has

already bought 28 million shares of the debtor to date and appears to be the single largest

shareholder.  Mr. Stern appeared in court and repeated under oath his firm and written

commitment to fund $2 million to debtor "as needed."   The Court specifically questioned Mr.

Stern and was made to feel confident that Mr. Stern regards his commitment as binding, even

if debtor's demands for capital appear early in the marketing campaign.  In addition, Mr.

Radovich in his declaration lists some 15 other persons or groups which he contends are

willing to commit various amounts between $50,000 and $1 million each in new capital for the

debtor, for a theoretical additional contribution of up to about $6 million .  The Court obviously

does not regard these hearsay comments from Mr. Radovich as commitments binding on

anyone who did not testify, and the actual amount that will be available in the end no doubt

depends heavily on how the early sales campaign develops. But even discounting these

sources, the Court is persuaded that for at least the first year debtor will more likely than not

have access to substantial capital that will allow it to make a go of the sales campaign and to

make the payments called for in this plan.

By the Court's reckoning, the payments due YA Global will be about $39,740.83 per

month on its Class 2 claim, and another $29,478.04[17] per month on its Class 5 claim at the

cramdown rates, for a combined total of $69,218.87 per month.  According to debtor's

confirmation brief at page 4, the rest of the creditors will be entitled to about another $46,303

per month, for a monthly grand total of about $115,552.  Even if the sales of PreHistin® are

---

[17]  As held in this court's Statement of Decision on the estimation motions, the Class 5 claim is
subject to increase to the extent there are interest and fees accrued prepetition.

slower than predicted, and sales do not bring a positive bottom line for an extended period, say

twelve months, there should still be enough money available to make the promised payments

nearly from the promised additional capital of Mr. Stern alone provided the aggregate amount

of initial cumulative losses is not exceeded, i.e. 12 X $115,552= -$1,386,624 + <$753,000> = -

$2,139,624.  The problem, of course, will be in obtaining the continued contributions if the

sales do not develop as predicted beyond that.  But the Court takes solace from the fact that

various parties have already contributed some $25 million to date even though there has never

been *any* PreHistin® sold amounting to more than a few thousand in any month.  The

predicted sales to the Russian customer and other such far-fetched possibilities are heavily

discounted as they are, at best, preliminary. But taken as a whole, the Court believes there is

sufficient reason (just barely) to believe it more probable than not that enough profit will be

realized such, when combined with promised new capital, that debtor's plan is feasible, if not

nearly the profitable bonanza indicated in the projections.  As already observed, however, the

Court takes solace from the fact that if the projections are substantially missed during the first

twelve months such that any monthly installment owed to YA Global is missed, and/or the

promised additional investment is not forthcoming, YA Global will have immediate access to its

collateral after a ten-day grace period.

For the reasons stated above, the Court need not analyze the confirmability of YA

Global's plan since clearly debtor's plan is more favorable to both the creditors and to equity.

11 U.S.C. §1129(c).


## 4.  Conclusion

The Court finds that debtor's plan meets all of the criteria set forth in 11 U.S.C. §1129(a)

except subsection (a)(8), but that with respect to the dissenting classes, the plan meets the

criteria set forth in §1129(b)(1) and (2) such that confirmation may be ordered.  Debtor is to

present an order consistent with this Statement of Decision which Statement will also serve as

findings of fact and conclusions of law as required in FRBP 7052.


###


DATED: April 7, 2010

_____
United States Bankruptcy Judge

**NOTE TO USERS OF THIS FORM**:

**1)** Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.
**2)** The title of the judgment or order and all service information must be filled in by the party lodging the order.
**3)  Category I.** below:  The United States trustee and case trustee (if any) will always be in this category.
**4)  Category II.** below:  List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or
attorney) who filed an opposition to the requested relief.  <u>DO NOT</u> list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) <u>STATEMENT OF DECISION ON PLAN CONFIRMATIONS</u> was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I.  SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order.  As of <u>April 7, 2010</u>, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

Phillip Ashman    mgolod@mcqueenashman.com,
pashman@mcqueenashman.com;bkumamoto@mcqueenashman.com
James C Bastian    jbastian@shbllp.com
Robert P Goe    kmurphy@goeforlaw.com, rgoe@goeforlaw.com;mforsythe@goeforlaw.com
Michael J Hauser    michael.hauser@usdoj.gov
Theodore E Malpass    temalpass@aol.com
Gordon G May    hpc@ggb-law.com
Keith C Owens    kowens@foley.com
Carmela Pagay    ctan@rdwlawcorp.com
Eric S Pezold    epezold@swlaw.com, dwlewis@swlaw.com
Michael B Reynolds    mreynolds@swlaw.com, kcollins@swlaw.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
Victor A Vilaplana    vavilaplana@foley.com

☐ Service information continued on attached page

**II.  SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

David Filler
Levey, Filler, Rodriguez, Kelso & DeBian
1688 Meridian Ave., Ste 902
Miami Beach, FL 33139

C. Luckey McDowell
Jennifer Stewart
Baker Botts LLP
2001 Ross Avenue
Dallas, TX 75201-2980

☐ Service information continued on attached page

**III.  <u>TO BE SERVED BY THE LODGING PARTY</u>:** Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

☐  Service information continued on attached page